UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

MARIA CAMPOS,                                    :
           Plaintiff,                       :
                                  :
           v.                                   :       C.A. No. 13-216ML
                                  :
CAROLYN W. COLVIN, ACTING                        :
COMMISSIONER OF SOCIAL SECURITY,                 :
           Defendant.                      :

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

       Plaintiff Maria Campos claims that she has been disabled since March 1, 2002, because of kidney cancer (stage two renal cell carcinoma), abdominal and low back pain and ADHD.[1] Her case is now before this Court on her Motion for reversal of the decision of the Commissioner of Social Security (the "Commissioner"), denying Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act"). Plaintiff contends that the determination of the administrative law judge ("ALJ") to stop the sequential analysis at Step Two based on his finding that Plaintiff does not suffer from any impairment or combination of impairments that has significantly limited her ability to perform basic work was infected by errors of law and not

---

[1] ADHD refers to attention-deficit/hyperactivity disorder. <u>Diagnostic and Statistical Manual of Mental Disorders</u> 59-66 (5th ed. 2013) ("DSM-5"). The short hand for attention deficit disorder without hyperactivity is ADD. As Plaintiff's application explains, "I have been diagnosed with the umbrella condition of Adult Attention Deficit Hyperactivity Disorder (ADHD); however, I have (ADD)." Tr. 243. Consistent with her explanation, most of Plaintiff's medical records refer to ADD, though some refer to ADHD or to ADD/ADHD. For simplicity, I will use ADHD, which is the name of the title of the relevant section in DSM-5. DSM-5 at 59-66. Based on her statement, Plaintiff would appear to meet the inattention diagnostic criteria for ADD, and not the criteria for hyperactivity or impulsivity. DSM-5 at 59-60.

supported by substantial evidence. Defendant Carolyn W. Colvin has filed a Motion for an order affirming the Commissioner's decision.

This matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Having reviewed the record and mindful that an impairment is not "severe" at Step Two only if it would have no more than a minimal effect on the ability to work, SSR 85-28, 1985 WL 56856, at *2 (Jan. 1, 1985), I find that the ALJ's findings are well supported by substantial evidence. Accordingly, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 12) be DENIED and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 14) be GRANTED.

## I.      Background Facts

Plaintiff, Maria Campos, was born in 1965. Tr. 235. She was 37 as of her alleged onset date, March 1, 2002; because she has not worked since, she is insured for Social Security purposes only through March 31, 2007. Id.

Plaintiff completed high school and has an Associate's Degree in preschool education. Tr. 111. Prior to March 2002, she worked full-time for many years as a preschool teacher, a teacher aid and a shoe sales associate. Tr. 166. She stopped working on March 1, 2002, after she was laid off by the preschool, along with two others, because the school "was overstaffed" and "from the lack of children;" she believes that part of the reason was also related to "the ADD, the ADHD." Tr. 117-18. After she was laid off, she applied for and was awarded unemployment benefits. Tr. 118. Two months after she was laid off, a health provider noted that "[s]he is doing well. . . . [s]he has recently returned from a three-week trip to Florida." Tr. 607-08. Within two years after she was laid off, she had become a full-time college student at

Rhode Island College, pursuing a double major in information systems and human resource management. Tr. 113. After the first year of college, she reduced her college course load because it was hard to enroll in the classes she wanted due to prerequisites. Tr. 115. She took no classes during the fall semesters of 2008 and 2009 because of two laparoscopic surgical procedures, but continued with a reduced schedule in the spring and summer. Tr. 116. When not in school, she engaged in a wide range of activities: driving, caring for pets (walking the dog four times a day, changing the cats' litter box), preparing meals, shopping, vacuuming, laundry, mopping the floor and loading and unloading the dishwasher; pursuing hobbies and interests (crocheting, reading, horseback riding and internet research on genealogy); and socializing (movies, out to dinner, visiting her aunt and sister and watching her niece). Tr. 143, 304-11, 440. Plaintiff lives with her parents in a two-story home. Tr. 113.

**A.  Physical Medical Evidence.**

Plaintiff's most significant medical diagnosis is kidney cancer, which she had in the early 1990's; after she was diagnosed with renal cell carcinoma,[2] she had a successful left side nephrectomy (kidney removal) in 1995. Tr. 341. Throughout the period of alleged disability, Plaintiff has been continually monitored and there is no evidence of recurrence. Tr. 177. The kidney cancer is unrelated to any impairment or functional limitation in the relevant period, except to the extent that the 1994 surgery led to adhesions that now cause pain. Tr. 152. Plaintiff also has benign cysts on the right kidney and on the right ovary;[3] these have been followed by CT scan, MRI and visualized during 2008 laparoscopic surgery (when the ovarian

---

[2] The medical expert who testified at the hearing, Dr. Stephen Kaplan, explained that this type of cancer has a 90-95 percent cure rate. Tr. 152.

[3] An ultrasound performed in August 2008 also found bilateral ovarian cysts, but concluded that they are "likely physiologic," Tr. 361, which are functional cysts that recur as part of the menstrual cycle, sometimes causing pain. See Overview of Ovarian Cysts by U.S. Nat'l Library of Medicine, http://www nlm nih.gov/medlineplus/ency/ article/001504 htm (last visited May 13, 2014).

cyst was drained) and no intervention has been deemed necessary other than continued monitoring. Tr. 348, 364, 417-20, 445. Neither has been linked to any functional limitations.

Plaintiff claims that her primary disabling impairment is "adhesion related disorder," which she believes causes abdominal, back and flank pain resulting in various functional limitations. Tr. 266-73. Both her testimony and the medical record establish that this claim of disabling pain is of relatively recent vintage. From onset in 2002 until late 2007, Plaintiff concedes that her only reason for not working was ADHD.[4] Tr. 135. Other than a complaint that her incision site was bothering her in 2005, in general, through March 2008, she did not report abdominal pain to her medical providers. See, e.g., Tr. 367, 370.

Beginning in May 2008, the records reflect that Plaintiff began reporting pain in her abdomen and occasionally lower back, which she attributed to adhesions caused by the cancer surgery. Tr. 133, 374, 393, 718. In June 2008, a CT scan revealed bilateral hydrosalpinx (blocked fallopian tubes). Tr. 348-49. In December 2008, to evaluate the cause of the pain and to determine whether she has adhesions, Dr. Mary Catherine DeRosa performed a pelviscopy; during the surgery, she lysed the minimal adhesions she found, biopsied a nodule on the right fallopian tube and drained the right ovarian cyst. At Plaintiff's request, she did not remove the bilateral hydrosalpinx. Tr. 417-20, 902. This procedure did not result in any findings to explain Plaintiff's complaints of pain. The post-surgical report notes no endometriosis and minimal pelvic adhesions. Tr. 906.

---

[4] It should be noted that Plaintiff is insured for Social Security purposes only through March 31, 2007. Accordingly, her application for DIB must be denied unless ADHD is found to have been a disabling condition while she was insured, since she did not suffer from any of the other impairments alleged as disabling until after she lost her insured status. Deblois v. Sec'y of Health & Human Servs., 686 F.2d 76, 79 (1st Cir. 1982); 42 U.S.C. §§ 416(i)(3), 423(a), 423(c); see Cruz Rivera v. Sec'y of Health & Human Servs., 818 F.2d 96, 97 (1st Cir. 1986) (if claimant becomes disabled after loss of insured status, claim for disability benefits must be denied despite disability).

When Plaintiff's complaints of abdominal pain persisted, on January 5, 2010, she had a second laparoscopic procedure, this time removing the bilateral hydrosalpinx, which were observed to be chronically inflamed. Tr. 691. Meanwhile, both Dr. DeRosa and the Lahey Clinic, where Plaintiff was also examined, opined that the most likely cause of the pain was "[m]inor musculoskeletal discomfort." Tr. 757, 904. Lahey recommended three weeks of Ibuprofen and sitz baths, predicting that her discomfort "should resolve spontaneously." Tr. 757, 904. At the hearing, Plaintiff testified that she deals with pain by taking Tylenol, which "works well." Tr. 151. After she continued to complain of pain to her primary care physician, Dr. Robert Ellison; he sent her for a second opinion to Dr. Gyan Pareek, who noted no abdominal pain and only left lower back and flank discomfort. Tr. 454-55. By October 2011, just before the hearing in this matter, Plaintiff told Dr. Ellison that she had no abdominal pain, but still complained of flank and back pain. Tr. 913. He did not prescribe anything for pain and scheduled her to return for her routine physical in six months. Tr. 915.

While the record includes lengthy letters from Plaintiff regarding her belief that she suffers from "adhesion related disorder," Tr. 266-73 (letter to Social Security Administration purporting to substantiate that she suffers from adhesion related disorder), Tr. 700-05 (letter to Dr. Kathleen Woodruff urging support for appeal of denial of disability benefits based on diagnosis of adhesion related disorder), no medical provider has diagnosed adhesion related disorder and Dr. DeRosa's postsurgical observations would appear to rule it out. See Tr. 155, 158-59, 904, 906. Dr. Kaplan, the medical expert, confirmed this conclusion. Tr. 155, 158-59.

Plaintiff now complains that her low back pain is also a severe impairment. The record references to back pain are sparse and generally link it to her complaints of pain caused by adhesions. See, e.g., Tr. 374, 393, 838. There is one reference to a 2001 chest X-ray that

confirmed previously diagnosed scoliosis, but there is no mention of scoliosis causing pain or any limitations.  Tr. 378.  In November 2002, Plaintiff mentioned right lower back pain to Dr. Ellison in the aftermath of a motor vehicle accident, but there is no evidence of any treatment.  Tr. 555.  Low back pain complaints surface again in 2009; for example, the Lahey Clinic labels it not as pain, but as "discomfort" and suggests Ibuprofen.  Tr. 757.  No treatment for back pain has been ordered by any medical provider.  There are no tests, x-rays or scans reflecting any back condition.  Plaintiff's comments in September 2010 to a nurse at West Bay Psychiatric, Patricia Reposa, that she had hip pain and was "not taking classes 2d to pain," were made during a visit when she was discussing her pending disability application; during the same visit, she also told Nurse Reposa that she was having "problems with adhesion related disorder," a condition that no medical provider has ever diagnosed.  Tr. 718.  Plaintiff complained of back and flank pain to Dr. Ellison in October 2011, but he simply discussed it with her, ordered no testing or follow-up and prescribed no medication.  Tr. 913-15.

### B.  Mental Medical Evidence

Plaintiff claims that she was diagnosed with ADHD in approximately January 2001 by psychiatrist, Dr. William Kyros, who was later barred from practicing and whose records have never been produced; accordingly, there is no evidence in the record from a medically acceptable source diagnosing this mental impairment.  Tr. 440, 552.  The timing of the diagnosis – January 2001 – is significant to an evaluation of the impact of ADHD on Plaintiff's ability to work, in that she was employed full-time through March 2002.  Further, one of the diagnostic criteria of ADHD is that several inattentive or hyperactive-impulsive symptoms have been present since at least the age of twelve; "ADHD begins in childhood."  DSM-5 at 60-61.  Accordingly, assuming that Plaintiff was correctly diagnosed with ADHD in January 2001, she had symptoms of

ADHD, yet was unimpaired and able to work full-time from 1997 until March 2002, even though she did not begin to take Adderall until approximately 2000. See Tr. 139.

Plaintiff's ADHD diagnosis is repeatedly referenced in Dr. Ellison's treatment notes; however, these references are based on history provided by Plaintiff, not on his diagnosis. Tr. 562, 573, 581, 584-85. Although Dr. Ellison, who is not a psychiatrist, did diagnose Major Depressive Disorder in October 2010, he did not treat for it and does not refer to it in his December 2010 Physician Examination Report. Tr. 783, 908-11. The only health care professional who dealt with ADHD was Nurse Reposa, who monitored Plaintiff's medication for treatment of ADHD; Nurse Reposa saw Plaintiff quarterly and consistently renewed the prescription for Adderall, finding that Plaintiff had an "adequate med response." Tr. 435, 436, 437, 438, 636.

Nurse Reposa's treatment notes reflect one mental status examination performed on April 20, 2009, when she noted "distractibility;" on the same form, she also noted that Plaintiff otherwise either had "no abnormalities" or was "intact." For strengths, she recorded that Plaintiff likes to "read, crochet, horseback riding." Tr. 440-41. Overall, Nurse Reposa concluded that Plaintiff's ADHD was controlled by a "successful Rx for ADL (Adderall)." Tr. 439-41. In March 2010, Nurse Reposa's notes stated that Plaintiff reported that she was doing well; her assessment was that Plaintiff was "at baseline level of function." Tr. 434. In June 2010, her notes indicate, "doing ok 2 classes left – struggles – but trying." Tr. 636. In the months while Plaintiff's SSI application was pending, Nurse Reposa's notes reference "adhesion related disorder = pain" based on Plaintiff's reports to her, but consistently indicate that Plaintiff had an "adequate med response" to Adderall to treat ADD. Tr. 716-20. Plaintiff's application

corroborates this conclusion; she wrote that, with Adderall, "I can concentrate for as long as needed to complete tasks." Tr. 310.

In support of her SSI/DIB application, Plaintiff presented two evaluative opinions, one from Dr. Ellison, her primary care physician, and one from Nurse Reposa.

On December 3, 2010, Dr. Ellison set out his opinion on a form prepared for the Rhode Island Department of Human Services. He concluded that the primary reason for his conclusion that Plaintiff "cannot work now or any time in [the] near future" was adhesion related disorder; as secondary reasons, he listed ADHD and low back pain. Tr. 908-11. His reference to adhesion related disorder is based on Plaintiff's report, not on any medical evidence; his reference to ADHD also comes from Plaintiff and is not a condition for which he ever provided treatment; low back pain is something Dr. Ellison discussed with Plaintiff, but which he never treated or sent her for treatment by others. Based on this flimsy foundation, Dr. Ellison opined that Plaintiff is limited to walking less than two hours in an eight-hour work day, standing less than two hours in an eight-hour work day and sitting four hours in an eight-hour work day. Tr. 910.

The limitations Dr. Ellison listed in his opinion are inconsistent with Plaintiff's daily activities (e.g., walking the dog four times a day, performing housework like vacuuming), her intellectual pursuits (e.g., college courses, internet research on genealogy) and her self-report (e.g., "I can follow written instructions quite well"). Tr. 120, 142-43, 310. They are also inconsistent with Dr. Ellison's treatment notes; for example, at Plaintiff's October 2011 appointment with Dr. Ellison, she complained of flank and back pain, as well as stress due to her parents' health issues, but he ordered no treatment or tests and prescribed no medications, apart from a flu vaccine and setting her next routine physical appointment. Tr. 915.

Nurse Reposa filled out her first "Supplemental Questionnaire as to Residual Functional Capacity" on December 28, 2010, concluding that Plaintiff had suffered from "moderately severe" and "severe" limitations in virtually every category from the age of five. Tr. 713-14. For example, with no basis for the conclusion in her treatment records and inconsistent with Plaintiff's self-description, Nurse Reposa opined that Plaintiff is severely limited in her ability to respond to customary work pressures. Compare Tr. 714, with Tr. 301-02 ("I handle stress quite well"). Similarly, Nurse Reposa opined that Plaintiff is severely limited in her ability to follow instructions, while Plaintiff reported that, "I can follow written instructions quite well." Compare Tr. 713, with Tr. 301. Nurse Reposa's conclusion that Plaintiff has moderately severe limitations in her ability to respond to supervision and severe limitations in her ability to get along with co-workers is inconsistent with Plaintiff's self-description that she gets along with authority figures quite well, and has never lost a job due to problems getting along with others. Compare Tr. 713, with Tr. 302. In October 2011, Nurse Reposa reiterated these conclusions. Tr. 858-59. As with her first report, there is no suggestion in her treatment notes of what she relied on to form these conclusions particularly where her treating relationship with Plaintiff was simply to review the efficaciousness of the medication prescribed for ADHD, which she consistently found was effective. Id.

II.   **Travel of the Case**

On May 22, 2010, Plaintiff filed her application for DIB, and on January 3, 2011, protectively filed for SSI. Tr. 54, 172, 211-23. In connection with these applications, state agency consultant, Dr. Elizabeth Conklin, prepared a medical assessment based on a file review in June 2010; she opined that the file reflected no evidence of recurrent cancer and no evidence of any functionally limiting somatic (physical) impairment. Tr. 175. Agency psychologist, Dr.

J. Litchman, performed a psychiatric review technique assessment based on a file review and opined that Plaintiff has a medically determinable impairment, ADHD, that is not severe. Tr. 175-76. On reconsideration, agency physician Dr. Youssef Georgy performed a second file review and corroborated Dr. Conklin's opinion that no physical impairment is "severe." Tr. 184-85. A second psychiatric review by psychologist Dr. Jeffrey Hughes in December 2010 corroborated Dr. Litchman's conclusion. Tr. 185-87.

Plaintiff's claims were denied both initially and upon reconsideration. Tr. 172-91. On January 7, 2011, Plaintiff filed a request for an administrative hearing, which was held before an ALJ on October 26, 2011. Tr. 103-70, 198. At the hearing, Plaintiff was represented by counsel; she, vocational expert Kenneth R. Smith and medical expert Dr. Stephen Kaplan testified. Tr. 105-70. The ALJ issued his decision on November 14, 2011, finding that Plaintiff is not disabled within the meaning of the Act. Tr. 54-63. After the Appeals Council denied Plaintiff's request for review, the ALJ's decision became the final decision of the Commissioner. Tr. 1-3.

### III.    The ALJ's Hearing and Decision

At the hearing, Plaintiff testified about her college courses and the reasons she lost her last job. Tr. 113-18. Prior to that, from 1997 through 2002, she worked in various preschool settings, all at full-time positions. Tr. 119. Since 2002, she testified, "I've been going to school." Tr. 120. In explaining why she claims she cannot work, Plaintiff focused on the pain she believes is caused by adhesions that interfere with sleep and limit bending, squatting and lifting, as well as a "strange sensation with the sciatic nerve down the leg" that limits her ability to stand for extended periods. Tr. 121-23. She also mentioned "slight pain and discomfort across the lower back." Tr. 123. To address the pain, she testified, "[a]t this point Tylenol works well." Tr. 151. In addition, ADHD causes her to lose focus between three and six times a

day for a minute or two and Adderall, which she has taken since 2000, controls this symptom though it does not eliminate it entirely. Tr. 139. Despite a claim of onset in 2002, Plaintiff said that she did not have any physical symptoms prior to 2007, Tr. 134, and that it really "started to pick up [in] 2008," Tr. 135.

Medical Expert Dr. Stephen Kaplan testified at the hearing. He testified that Plaintiff had been free of cancer for over ten years – it is not a current impairment. Tr. 152. He observed that the complaints of lower back pain are infrequent and Plaintiff denied back pain at medical appointments in 2008 and 2009. Id. Noting that the most serious alleged impairment appears to be adhesion related disorder, Dr. Kaplan explained the nature of adhesions; he confirmed that no imaging studies substantiated a level of adhesion sufficient to cause her pain, that the 2008 exploratory laparoscopic procedure did not uncover extensive adhesions, and that there is no diagnosis of adhesion related disorder from any medical source. Tr. 158-63.

Vocational Expert Kenneth Smith testified that Plaintiff's past relevant work as a preschool teacher, teacher aid and shoe sales associate was light and semi-skilled. Tr. 166. He responded to a hypothetical question about work available to a person who can perform work only at the sedentary level and is further limited in the ability to bend and squat, and lift more than twenty pounds. Tr. 168. Mr. Smith testified that such an individual could not perform Plaintiff's past relevant work but could perform "sedentary occupations which are sitting down and lifting up to 10 pounds" such as assembler, hand packager and inspector. Tr. 168-69. The ALJ then added the additional limitation that the person is off-task five percent of the day, and Mr. Smith testified there would be no reduction in jobs such as assembler, hand packager and inspector. Id. However, if a person is off task ten to twenty percent of the day, task completion would be precluded. Id. On questioning by Plaintiff's attorney, Mr. Smith testified that "a

severe limitation in responding . . . appropriately to customary work pressure such as attendance, punctuality, and pace" would preclude all jobs. Tr. 170.

In his written decision, the ALJ first found that Plaintiff met the insured requirements of the Act through March 31, 2007. Tr. 57. He then began to proceed through the familiar five-step inquiry. After concluding that Plaintiff had not engaged in substantial gainful activity since the alleged onset date on March 1, 2002, at Step One, he proceeded to Step Two, where he considered various medically determinable impairments: renal cell carcinoma, adhesions, ovarian cysts, hydrosalpinx, history of bronchitis, high blood pressure and ADHD. In an extensive analysis of all of the evidence in the record, the ALJ examined each impairment and concluded that none separately or in combination has significantly limited or is expected to significantly limit Plaintiff's ability to work for twelve consecutive months. Id. Accordingly, he found that Plaintiff does not have a severe impairment or combination of impairments as defined by the Act, ending the analysis at Step Two. Based on this finding, the ALJ concluded that Plaintiff has not been under a disability as defined by the Act since 2002 through the date of his decision. Tr. 62.

The ALJ's decision focused carefully on the medical evidence, Tr. 57-60, and in examining potential mental impairments, on evidence of daily living activities, social functioning, concentration, persistence and pace and the absence of any episodes of decompensation. Tr. 61-62. In performing this evaluation, the ALJ concluded that Plaintiff's medically determinable impairments could not reasonably be expected to cause her claimed physical symptoms to the degree alleged; this adverse credibility finding was based on discrepancies between her physical complaints and the activities reflected in the medical

evidence but also on the degree to which her symptoms were not reasonably related to a specific medically determinable impairment. Tr. 58.

The ALJ's findings with respect to physical impairments may be briefly summarized: cancer has been in remission since successful surgery in 1994 and the cysts are stable and benign with no correlation to any limitation, id.; adhesion related disorder is unsupported by the objective medical record and the evidence of adhesions cannot reasonably be expected to produce the reported symptoms, Tr. 59; bronchitis and the intermittent findings of high blood pressure are not linked to any evidence that either condition causes more than minimal functional limitations, Tr. 60; and the record reflects only isolated complaints of back pain, with no evidence of loss of range of motion, motor strength or mobility, no objective findings and no radiological imaging reflecting any spinal impairment of any sort, id.

In reaching these conclusions, the ALJ considered not only the medical evidence, but also opinion evidence from four sources. He afforded Dr. Ellison, Plaintiff's long-time primary care physician, little weight because his conclusions are principally based on Plaintiff's report of adhesion related disorder, a diagnosis that is inconsistent with the medical evidence, and because his conclusions are otherwise contrary to the objective medical evidence, including his treatment notes, which describe intact physical functioning. Tr. 60. By contrast, the ALJ afforded great weight to Dr. Conklin and Dr. Georgy; both opined that Plaintiff did not suffer from any severe physical impairment, a conclusion buttressed by Dr. Kaplan's expert testimony. Id.

With respect to Plaintiff's mental impairments, the ALJ noted, correctly, that the record does not reflect a diagnosis of ADHD by an acceptable medical source. Nevertheless, he assumed that ADHD was established and looked further for evidence of functional consequences having more than a minimal impact on Plaintiff's capacity to work. Tr. 61. He focused on

Plaintiff's testimony establishing that Adderall effectively treats her symptoms, that, at most, she zones out a few times a day for no more than two minutes, and that despite ADHD, she was able to complete college courses in a dual degree program, at times carrying a full-time load.  Id.  He also noted Nurse Reposa's treatment notes regarding her mental status examination of Plaintiff in April 2009, which noted only "distractibility" as a functional limitation, otherwise scoring Plaintiff as functioning without limitation.  Id.  As required by 20 C.F.R. §§ 404.1520a and 416.920a,[5] the ALJ examined the functional areas known as the "paragraph B" criteria, 20 C.F.R., Part 404, Subpart P, Appendix 1, and concluded that Plaintiff is no more than mildly impaired in activities of daily living, social functioning and concentration, persistence and pace and has had no episodes of decompensation.  Tr. 62.

Noting her inconsistent treatment notes, the lack of evidence that she is an acceptable medical source and the lack of foundation for her conclusions, the ALJ afforded little weight to Nurse Reposa's responses on two "Questionnaires as to Residual Functional Capacity."  Tr. 61. Instead, he afforded great weight to the two psychologists, Drs. Litchman and Hughes, both of whom concluded that ADHD does not constitute a severe mental impairment.  Id.

## IV.    Issues Presented

Plaintiff presents two arguments, which she contends establish that the decision of the Commissioner that she is not disabled within the meaning of the Act is not supported by substantial evidence in the record and is infected by legal error:

1.  The ALJ erred in failing to consider the treating notes and opinion from Nurse Reposa.

2.  The ALJ erred in finding that Plaintiff does not suffer from a severe impairment.

---

[5] The Social Security Administration has promulgated identical sets of regulations governing eligibility for DIB and SSI.  See McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1120 n.1 (1st Cir. 1986).  For simplicity, I cite to one set only.  See id.

## V.   <u>Standard of Review</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  <u>Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981); <u>Brown v. Apfel</u>, 71 F. Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by substantial evidence, the Commissioner must be affirmed, even if the Court would have reached a contrary result as finder of fact.  <u>Rodriguez Pagan v. Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987); <u>see also</u> <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991); <u>Lizotte v. Sec'y of Health & Human Servs.</u>, 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. <u>Brown</u>, 71 F. Supp. 2d at 30; <u>see also</u> <u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987); <u>Parker v. Bowen</u>, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  <u>Brown</u>, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  <u>Id.</u> at 30-31 (citing <u>Colon v. Sec'y of Health & Human Servs.</u>, 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  <u>Id.</u> at 31 (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 399 (1971)).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical

evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20

C.F.R. §§ 404.1529(a), 416.929(a).

## VI.    Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than

twelve months.  42 U.S.C. §§ 416(I), 423(d)(1); 20 C.F.R. §§ 404.1505, 416.905.  The

impairment must be severe, making the claimant unable to do previous work, or any other

substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20

C.F.R. §§ 404.1505-1511, 416.905-911.

### A.     Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a

treating physician unless there are good reasons to do otherwise.  See Rohrberg v. Apfel, 26 F.

Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. §§ 404.1527(c), 416.927(c).  If a treating

physician's opinion on the nature and severity of a claimant's impairments is well-supported by

medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with

the other substantial evidence in the record, the ALJ must give it controlling weight.  Konuch v.

Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. §§

404.1527(c)(2), 416.927(c)(2).  The ALJ may discount a treating physician's opinion or report

regarding an inability to work if it is unsupported by objective medical evidence or is wholly

conclusory.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir.

1988).  The ALJ's decision must articulate the weight given, providing "good reasons" for the

determination.  See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12

(D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir.1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R §§ 404.1527(c), 416.927(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

A treating source who is not a licensed physician or psychologist[6] is not an "acceptable medical source." 20 C.F.R. §§ 404.1513, 416.913; SSR 06-03p, 2006 WL 2263437, at *2 (Aug. 9, 2006). Only an acceptable medical source may provide a medical opinion entitled to controlling weight to establish the existence of a medically determinable impairment. SSR 06-03p at *2. An "other source," such as a nurse practitioner or licensed clinical social worker, is not an "acceptable medical source," and cannot establish the existence of a medically determinable impairment, though such a source may provide insight into the severity of an impairment, including its impact on the individual's ability to function. Id. at *2-3. In general,

---

[6] The regulations recognize other categories of providers as acceptable medical sources for certain impairments; for example, a licensed optometrist is acceptable for measurement of visual acuity and visual fields. SSR 06-03p at *1.

an opinion from an "other source" is not entitled to the same deference as an opinion from a treating physician or psychologist.  Id. at *5.  Nevertheless, the opinions of medical sources who are not "acceptable medical sources" are important and should be evaluated on key issues such as severity and functional effects, along with other relevant evidence in the file.  Id. at *4.

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. §§ 404.1527(d), 416.927(d).  The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's RFC (see 20 C.F.R. §§ 404.1545-1546, 416.945-946), or the application of vocational factors because that ultimate determination is the province of the Commissioner.  20 C.F.R. §§ 404.1527(d), 416.927(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

**B.      The Five-Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability.  See 20 C.F.R. §§ 404.1520, 416.920.  First, if a claimant is working at a substantial gainful activity, the claimant is not disabled.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, if a claimant does not have any impairment or combination of impairments that significantly limit physical or mental ability to do basic work activities, then the claimant does not have a severe impairment and is not disabled.  Id. §§ 404.1520(c), 416.920(c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Appendix 1, the claimant is disabled.  Id. §§ 404.1520(d), 416.920(d).  Fourth, if a claimant's impairments do not prevent doing past relevant work, the claimant is not disabled.  Id. §§ 404.1520(e)-(f); 416.920(e)-(f).  Fifth, if a claimant's

impairments (considering RFC, age, education and past work) prevent doing other work that

exists in the local or national economy, a finding of disabled is warranted.  Id. §§ 404.1520(g),

416.920(g).  Significantly, the claimant bears the burden of proof at Steps One through Four, but

the Commissioner bears the burden at Step Five.  Wells v. Barnhart, 267 F. Supp. 2d 138, 144

(D. Mass. 2003) (five step process applies to both DIB and SSI claims).

In determining whether a claimant's physical and mental impairments are sufficiently

severe, the ALJ must consider the combined effect of all of the claimant's impairments and must

consider any medically severe combination of impairments throughout the disability

determination process.  42 U.S.C. § 423(d)(2)(B).  Accordingly, the ALJ must make specific and

well-articulated findings as to the effect of a combination of impairments when determining

whether an individual is disabled.  Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993).

The claimant must prove the existence of a disability on or before the last day of insured

status for the purposes of disability benefits.  Deblois, 686 F.2d at 79; 42 U.S.C. §§ 416(i)(3),

423(a), 423(c).  If a claimant becomes disabled after loss of insured status, the claim for

disability benefits must be denied despite disability.  Cruz Rivera v. Sec'y of Health & Human

Servs., 818 F.2d 96, 97 (1st Cir. 1986).

### C.      Severity at Step Two

The second step in the sequential evaluation requires a determination whether the medical

evidence establishes an impairment or combination of impairments of such severity as to be the

basis for a finding of inability to work.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment

or combination of impairments is "not severe" and a finding of "not disabled" is made at Step

Two only when the medical evidence establishes a slight abnormality that would have no more

than a minimal effect on an individual's ability to work.  SSR 85-28 at *2.  As our Circuit Court

has clarified, Step Two is a screening device to eliminate applicants whose impairments are so minimal that, as a matter of common sense, they are clearly not disabled from gainful employment. McDonald v. Sec'y of Health & Human Servs., 795 F.2d 1118, 1123 (1st Cir. 1986).

A special technique is used in evaluating the severity of mental impairments at Step Two. See 20 C.F.R. §§ 404.1520a(a), 416.920a(a). In addition to reviewing the medical evidence, the ALJ must evaluate four areas of mental functioning deemed essential to work: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation. See Figueroa–Rodriguez v. Sec'y of Health & Human Servs., 845 F.2d 370, 372 (1st Cir. 1988); Guyton v. Apfel, 20 F. Supp. 2d 156, 165 (D. Mass. 1998). The ALJ's decision must document application of the special technique. See 20 C.F.R. §§ 404.1520a(e)(2) 416.920a(e)(2); Echandy-Caraballo v. Astrue, No. CA 06-97 M, 2008 WL 910059, at *6 (D.R.I. Mar. 31, 2008).

While Step Two constitutes a *de minimis* screening device, as long as the ALJ utilizes the correct definitional framework, denial of disability benefits at Step Two is appropriate when the "medical evidence establish[es] only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on [the claimant's] ability to work even if the individual's age, education, or work experience were specifically considered . . . ." Gonzalez-Ayala v. Sec'y of Health & Human Servs., 807 F.2d 255, 256 (1st Cir. 1986) (citation and quotation marks omitted). If there is substantial evidence in the record to support the ALJ's conclusion that the claimant's impairments were not shown to limit his activities in any way that would interfere with work activity, it should be affirmed. Id. It must be noted that, at Step Two, it remains the claimant's burden "to make a reasonable threshold showing that the impairment is

one which could conceivably keep him or her from working." Freeman v. Barnhart, No. 02-78-P-H, 2002 WL 31599017, at *6 (D. Me. Nov. 20, 2002) (citation omitted); see Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001) (claimant carries burden of production and proof at first four steps of sequential process); Colon v. Astrue, C.A. No. 11-534-M, 2013 WL 586798, at *3 (D.R.I. Feb. 13, 2013) (same).

**D.      Making Credibility Determinations**

When an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Rohrberg, 26 F. Supp. 2d at 309-10.  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  See Frustaglia, 829 F.2d at 195.

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

**E.      Pain**

"Pain can constitute a significant non-exertional impairment." Nguyen, 172 F.3d at 36. Congress has determined that a claimant will not be considered disabled unless medical and other evidence (e.g., medical signs and laboratory findings) is furnished showing the existence of

a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). The ALJ must consider all of a claimant's statements about symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §§ 404.1528, 416.928. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the First Circuit's six-part pain analysis and consider the following factors:

> 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
>
> 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
>
> 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;
>
> 4. Treatment, other than medication, for relief of pain;
>
> 5. Functional restrictions; and
>
> 6. The claimant's daily activities.

Avery, 797 F.2d at 29; Gullon v. Astrue, No. 11-cv-099ML, 2011 WL 6748498, at *5-6 (D.R.I. Nov. 30, 2011). An individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423(d)(5)(A). Guidance in assessing the credibility of the claimant's statement is provided by the Commissioner's 1996 ruling. SSR 96-7p, 1996 WL 374186 (July 2, 1996). Credibility of an individual's statement about pain or other symptoms and their functional effects is the degree to which the statement can be believed and accepted as true; in making this determination, the ALJ must consider the entire case record and may find that all, only some, or none of an individual's allegations are credible. Id. at *4. One strong indication of the

credibility of an individual's statements is their consistency, both internally and with other information in the record. Id. at *5-6.

## VII.  **Application and Analysis**

### A.  **ALJ's Treatment of Nurse Reposa's Opinion**

Plaintiff challenges the ALJ's determination to afford little weight to the two opinions from Nurse Reposa. Tr. 61, 712-14, 858-59. I find no legal error.

Plaintiff's contention that the ALJ did not consider Nurse Reposa's opinions and treatment notes at all is simply wrong. The ALJ correctly classified Nurse Reposa as a provider who is "not an acceptable medical source," so that her references to a diagnosis of ADHD are insufficient to establish that condition as a medically determinable impairment. SSR 06-03p at *2. Nevertheless, the ALJ assumed the existence of ADHD, based on other evidence. Moriarty v. Astrue, Civil No. 07-cv-342-SM, 2008 WL 4104139, at *5 (D.N.H. Aug. 28, 2008) (if no medical record in time period to support finding of impairment, ALJ may assume impairment exists based on secondary references). Using that assumption and focusing on Nurse Reposa's treatment notes, as well as Plaintiff's application and testimony, he analyzed what weight to afford Nurse Reposa's opinions. Correctly employing the standard treating source rubric, but also factoring in that she is not an acceptable medical source, the ALJ noted that Nurse Reposa provided no explanation for how she reached her conclusions, which are inconsistent with her own evaluation that Plaintiff's mental functioning was essentially normal. Accordingly, he determined to give her opinions little weight. Tr. 61. The ALJ did not err in considering as one factor that Nurse Reposa is not an acceptable medical source: the relevant Social Security Ruling makes clear that "acceptable medical sources are the most qualified health care professionals" so

that their opinions are entitled to greater weight.  SSR 06-03p at *5 (internal quotation marks omitted).

Plaintiff counters that Nurse Reposa worked closely with a physician, so her opinions are the equivalent of an opinion from an acceptable medical source.  She provides no support for this argument and there is no record evidence that Nurse Reposa's notes or opinions were co-signed by a treating physician or that there was any psychiatrist or psychologist involved with Nurse Reposa in Plaintiff's treatment.  In any event, even if Nurse Reposa's opinions were afforded the weight given to those of a treating physician, they are so starkly inconsistent not only with her treatment notes, but also with Plaintiff's statements about her limitations in her application and testimony, as to justify the ALJ's determination to afford them little weight.

Plaintiff also contends that the ALJ did not consider Nurse Reposa's notations referring to distractibility, Plaintiff's struggles in certain classes and her observation that Plaintiff is "doing well within her limitations (no excessive requirements or stimuli)."  Tr. 434, 435, 441. This critique[7] is beside the point.  As the ALJ noted, the same treatment notes also reflect that Plaintiff was successful in continuing to attend college while supposedly disabled.  Tr. 61, 114, 434, 636.  Similarly, Nurse Reposa's notes reflect that Plaintiff's ADHD was successfully treated with Adderall, a conclusion corroborated by Plaintiff's statements, both in her application and testimony.  Tr. 61, 137-38, 310 ("I have ADHD and I take medication for it; therefore, I can concentrate for as long as needed to complete tasks.").  Nurse Reposa's only mental status examination (which is also the only one in the record) establishes not only that Plaintiff is distractible, but also that Plaintiff has no abnormalities of motor activity, speech, thought process, thought content or perception; no disturbance of mood; and her memory, intellectual

---

[7] The argument is also inaccurate.  The ALJ specifically referenced Nurse Reposa's assessment of distractibility.  Tr. 61.

functioning, judgment and insight are all intact. Tr. 61, 728. The ALJ is entitled to resolve the inconsistencies in the record between these references and the snippets to which Plaintiff directs this Court. Seavey v. Barnhart, 276 F.3d 1, 10 (1st Cir. 2001); SSR 06-03p at *2. His determination regarding which to credit is not error. Id.

I find that the ALJ properly considered both Nurse Reposa's treatment notes and opinions, and did not err in affording little weight to her opinions.

### B. The ALJ's Finding of No Severe Impairments or Combination of Impairments at Step Two

Plaintiff seizes on the ALJ's determination to end the sequential analysis at Step Two, the screening step, arguing that the standard of what is "severe" at Step Two is so low that it is error to stop there in a case where Plaintiff had cancer in the past, carries a long list of diagnoses, is constantly seeking medical treatment and is constantly complaining about pain.

Plaintiff is right that the standard at Step Two a "*de minimis* one." McDonald, 795 F.2d at 1124. At Step Two, an impairment is not severe only if the "medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." Id. (citing SSR 85-28). Nevertheless, as long as there is substantial evidence – more than a scintilla – to support the ALJ's conclusion that none of Plaintiff's claimed impairments, neither alone nor in combination, had more than a minimal effect on her ability to work, the Commissioner's decision must be affirmed. Gonzalez-Ayala, 807 F.2d at 256 (substantial evidence means more than a scintilla); see Ortiz, 955 F.2d at 769. At Step Two, Plaintiff carries the burden of demonstrating that her impairments were severe. Freeman, 274 F.3d at 608 (claimant carries burden of production and proof at first four steps of sequential process).

Here, the ALJ correctly employed the evaluative standard for Step Two set out in SSR 85-28, which requires careful review of the medical findings and an informed judgment about their limiting effects on the individual's physical and mental ability to perform basic work. SSR 85-28 at *3. He also used the special technique for testing the severity of mental impairments in 20 C.F.R. § 404.1520a, which requires consideration of functioning in activities of daily living, social functioning, concentration, persistence and pace and episodes of decompensation. Id. § 404.1520a(c)(3). Using this analytical framework, the ALJ made findings that are well supported by substantial evidence demonstrating that Plaintiff is not functionally limited by any severe impairments; put differently, Plaintiff has failed to sustain her burden of showing that any of her claimed impairments, alone or in combination, cause more than slight abnormalities.

Little effort is needed to confirm the legal appropriateness of the ALJ's findings with respect to Plaintiff's list of alleged physical impairments. The ALJ's careful analysis of each recites the medical evidence, more than substantial, establishing that Plaintiff's cancer was long in remission, her adhesions minimal, her "adhesion related disorder" unsupported by any medical evidence, her cysts benign and without symptoms, her hydrosalpinx removed, her leukopenia mild, her bronchitis episodic and her hypertension intermittent and benign. Tr. 58-60. In concluding that none of these medical findings are severe, the ALJ properly relied on the medical opinions of Dr. Conklin, Dr. Georgy and the expert testimony of Dr. Kaplan. Tr. 60.

That leaves Plaintiff's complaints of pain, particularly back pain,[8] none of which were linked by any medical source to a determinable impairment. As a threshold matter, several of her treating physicians expressed skepticism about her reports of pain. See, e.g., Tr. 374 ("she has multiple odd complaints"); Tr. 894 ("I am hesitant to bring her to the operating room, as I

---

[8] Dr. Ellison occasionally included "lumbago" in his list of diagnoses. E.g., Tr. 460. However, his treatment notes establish that his source is Plaintiff's complaints and not any testing done by him or any other medical source.

feel that the imaging findings and examination do not suggest a high probability of pain from a gynecologic condition."). The ALJ similarly concluded that Plaintiff's claims of pain lack credibility, in reliance on the medical record and on Dr. Kaplan's[9] expert testimony about the degree of pain to be expected based on the objective medical findings. This evidence, when considered in light of Plaintiff's use of Tylenol and Ibuprofen for pain, and no records reflecting anything stronger, constitutes ample support for the ALJ's finding of lack of severity. See Avery, 797 F.2d at 29. The ALJ also committed no error in affording Dr. Ellison's opinion evidence little weight where it is inconsistent with the medical evidence, his own treatment notes and Plaintiff's statements about her ability to function. Craig v. Chater, 76 F.3d 585, 590 n.2 (4th Cir. 1996) ("There is nothing objective about a doctor saying, . . . 'I observed my patient telling me she was in pain.'").

The ALJ's determination that none of Plaintiff's mental impairments, including ADHD, constitute severe impairments is similarly well supported by substantial evidence and untainted by legal error. Plaintiff's contrary argument replays Nurse Reposa's references to distractibility, struggling with some college courses and "no excessive requirements or stimuli," as well as her opinions of Plaintiff's severe limitations. Plaintiff contends that these comments should be credited over all of the other evidence, including the evidence that ADHD is well controlled by Adderall and that Plaintiff's functioning in the four broad areas listed in 20 C.F.R. § 404.1520a is no more than minimally impacted by any mental impairment. This Court will not replow that

---

[9] Plaintiff challenges Dr. Kaplan's testimony based on the argument that Dr. Kaplan erroneously stated that Dr. Ellison's notes contained minimal complaints of back pain, "only one time." Tr. 153. In fact, Dr. Kaplan was referring only to Dr. Ellison's treatment notes from 2008 through June of 2010. Tr. 458-599. For that period, he is correct – these records reflect only two complaints of back pain; in both instances, Dr. Ellison's physical examination resulted in normal findings with respect to strength, muscle tone, movement, ambulation and gait. Dr. Ellison never ordered treatment or testing to address back pain; twice, he sent her to urologists for second opinions for her general pain complaints and both found mild discomfort with no need for follow-up. Tr. 454-55, 461-62, 468-69, 756-57. Plaintiff's complaints of back pain to Dr. Ellison began in earnest only after she filed her disability application. Tr. 838-55, 913-15. Even during the later period, Dr. Ellison never did anything other than talk to her about it. Tr. 839, 842, 850, 915. Plaintiff's claim that Dr. Kaplan was in error is without merit.

field in the face of all of the other evidence establishing the absence of functional limitations, including Plaintiff's years of full-time work until March 2002 despite ADHD, her attendance at college full-time or nearly full-time for part of her period of disability, her wide range of activities and her testimony that, with medication, "I can concentrate for as long as needed to complete tasks."[10]  Tr. 310.

Plaintiff tries to augment her mental impairments by focusing on Dr. Ellison's references to depression and anxiety.  Tr. 585, 839, 849, 914.  However, as the ALJ observed, these references do not represent a diagnosis from a psychiatrist with the training to assess and diagnose such disorders based on objective signs and tests; further, Plaintiff was never referred by Dr. Ellison to a psychiatrist for those complaints.  See Tr. 61.  Rather, they reflect what Plaintiff reported to him.  Id.  Further, even if Dr. Ellison's observations are deemed to constitute a diagnosis, that alone is insufficient to establish a severe impairment.  See Evans v. Astrue, No. CA 11-146 S, 2012 WL 4482366, at *11 (D.R.I. Aug. 23, 2012) ("diagnosis alone cannot support a finding that an impairment is severe").

While adjudicators are cautioned to exercise "[g]reat care" in applying the Step Two standard to deny benefits, SSR 85-28 at *3, in this case, the ALJ got it right.  There is no error in his finding that Plaintiff has no severe impairments or combination of impairments.

## VIII.  Conclusion

I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 12) be DENIED and the Commissioner's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 14) be GRANTED.

---

[10] Plaintiff argues that she lost her job in March 2002 due to ADHD.  That argument is belied by the record – Plaintiff testified that she was laid off, along with other workers, because the preschool was overstaffed.  Tr. 117-18.  She also speculated that ADHD somehow also played a role.  Id.  The ALJ is entitled to credit the former version.  See Seavey v. Barnhart, 276 F.3d 1, 10 (1st Cir. 2001); SSR 06-03p at *2.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
May 15, 2014